UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-----------------------------------------------------------------------X

**JSC TRANSMASHHOLDING**
BUTYRSKY VAL STREET, 26, BLDG. 1
MOSCOW, RUSSIA 127055

                      Plaintiff,

           v.

**JAMES F. MILLER**    AND    **CHRIS TAYLOR**
610 KINGS CLOISTER CIR.        ADDRESS UNKNOWN
ALEXANDRIA, VA 22302

                    Defendants.

-----------------------------------------------------------------------X

Civ. No._____

<u>COMPLAINT</u>

PLAINTIFF DEMANDS A
TRIAL BY JURY

        Plaintiff JSC Transmashholding ("Plaintiff" or "TMH"), by its attorneys, Cleary Gottlieb Steen & Hamilton LLP, for its Complaint against defendants James F. Miller ("Miller") and Chris Taylor ("Taylor" and together with Miller, the "Defendants"), alleges, upon personal knowledge with respect to its own acts, and upon information and belief with respect to the acts of others, as follows:

## NATURE OF THE ACTION

        1.    This is an action for conversion and unjust enrichment. It is what Plaintiff hopes will be the last chapter in its struggle to recover money stolen from it as part of an international criminal conspiracy that began in Switzerland, expanded to Hong Kong, and ultimately reached the United States.

        2.    TMH is Russia's largest manufacturer of railroad locomotives and cars. In September 2011, TMH discovered that it was a victim of fraud and embezzlement as a result of a conspiracy among a rogue TMH employee, a company called Richcom International Asia Ltd., and certain of Richcom's principals and affiliates (together, "Richcom"). Under a sham joint venture agreement with Richcom purportedly entered into by the rogue TMH employee on behalf of TMH, €20 million was taken—without the knowledge of or authorization from TMH's

proper management—from TMH's bank account in Zurich and transferred to Richcom's Hong Kong bank account.

3. Days after Richcom received the stolen money, defendant Chris Taylor, one of Richcom's directors, arranged for Richcom to transfer $600,000 of the stolen money to defendant James Miller as a purported "loan" from Taylor to Miller.  The circumstances surrounding this "loan" are dubious at best.  Although Taylor and Miller had never met, having only spoken by telephone a few times over a half-year period, Taylor was nonetheless willing to "lend" Miller $600,000 on extremely unusual and improbable terms—no stated maturity (but repayable only when "mutually agreeable"), automatic cancellation at Miller's death, very low interest due only at final maturity, and no apparent means of repayment.  To document this "loan", Miller himself prepared and signed a promissory note in favor of Taylor.  One has to wonder whether there was any bona fide intention ever to repay this "loan".

4. In October 2011, TMH sued Richcom in Hong Kong seeking to recover the €20 million that was stolen from TMH and wrongfully transferred to Richcom.  As the lawsuit unfolded, TMH discovered that $600,000 of the stolen money had been "loaned" by Taylor to Miller.

5. In February 2012, TMH confronted Miller and demanded repayment of the $600,000.  Although Miller has now known for a year and a half that the $600,000 Taylor "lent" him was in fact stolen from TMH, Miller has refused to repay the stolen money to TMH.

6. This action seeks to hold Miller and Taylor accountable for their wrongful conduct and to return the stolen $600,000 to TMH, its rightful owner.

**THE PARTIES**

7. Plaintiff TMH is Russia's largest manufacturer of railroad locomotives and cars.  It is a Russian closed joint-stock company with its headquarters in Moscow, Russia.

8. Defendant James F. Miller is a U.S. citizen who resides in the State of Virginia but is professionally based in the District of Columbia and the surrounding area. He is a lawyer and has been a member of the Bar of the District of Columbia since 1978. He was a partner in the Washington, D.C. office of the law firm DLA Piper from December 6, 2010 until 2012. He is currently President and Founder of Tax Legislative Solutions, LLC, and continues to serve clients in the Washington, D.C. area.

9. On information and belief, defendant Chris Taylor is a U.S. citizen who reportedly resides in the Philippines. In June 2011, he was a director of Richcom, a company incorporated in the British Virgin Islands on March 1, 2011, and purportedly based in Hong Kong.

## JURISDICTION AND VENUE

10. This Court has jurisdiction under 28 U.S.C. § 1332 based on the diversity of the parties and the amount in dispute exceeds $75,000.

11. Venue is proper within the District of Columbia under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims occurred within the District of Columbia. In particular, the promissory note that Miller signed in favor of Taylor is governed by the laws of the District of Columbia.

## FACTUAL ALLEGATIONS

**The Unauthorized Transfer of €20 Million from TMH to Richcom**

12. On or around June 3, 2011, without knowledge or approval of TMH's proper management, board of directors or its shareholders, Andrey Safronov ("Safronov"), a rogue TMH employee, conspired with Richcom and its principals in causing €20 million to be wrongfully transferred from TMH's account at Clariden Leu Bank in Zurich, Switzerland, to Richcom's account at HSBC in Hong Kong.

13. The €20 million was stolen from TMH in connection with a sham joint venture agreement purportedly entered into between TMH and Richcom as part of the international conspiracy and signed in two versions: the Joint Venture Profit Sharing Working Agreement dated May 30, 2011 (the "JV Agreement") and the Joint Venture Profit Sharing Working Agreement dated June 1, 2011 (the "Revised JV Agreement" and together with the JV Agreement, the "Sham Agreements"). The JV Agreement and Revised JV Agreement, which contained substantially the same terms, were entered into for the sole purpose of carrying out the transaction involving the unauthorized transfer of the €20 million from TMH. Rogue TMH employee Safronov purportedly signed the Sham Agreements on behalf of TMH, and William Tao ("Tao"), a Richcom director, signed on behalf of Richcom.

14. There were many suspicious circumstances surrounding the Sham Agreements. Both the JV Agreement and the Revised JV Agreement provided that the €20 million would be used to invest in "managed buy/sell trading program to purchase MTN paper [Medium-Term Notes]" and that there would be a yield of €200 million within 60 days after the receipt of the €20 million by Richcom, representing an absurd 1000% return in merely two months. In the end, aside from €250,000 "borrowed" and used by Tao for personal purposes and the $600,000 "lent" to Miller, the balance of the funds, approximately €19 million, was never invested or used, but retained in an account of Richcom at HSBC Hong Kong and in the accounts of two Richcom affiliates at Standard Chartered Bank in Hong Kong.

15. At no point did Safronov have the authority to enter into the JV Agreement or the Revised JV Agreement on behalf of TMH, a fact that he has later admitted in writing. He also admitted that he had no legitimate corporate purpose for entering into these transactions. TMH terminated Safronov's employment because of his involvement in the Sham

Agreements. There are ongoing criminal investigations in Zurich and Moscow relating to the international conspiracy involving the Sham Agreements, and Safronov is a defendant in both jurisdictions.

**The Promissory Note between Miller and Taylor**

16. Just days after the €20 million was stolen from TMH, Taylor, a Richcom director, sent Tao an email on June 5, 2011, requesting that Richcom lend Miller $600,000.

17. On June 6, 2011, Miller signed a promissory note, that he himself had drafted, in favor of Taylor as "lender" of the $600,000 (the "Promissory Note") (a true and correct copy of which is attached as Ex. 1).[1]

18. On June 7, 2011, Richcom resolved, as recorded in the minutes of the board meeting held on that date (the "June 7, 2011 Board Minutes," (a true and correct copy of which is attached as Ex. 2)), that Richcom would lend Miller $600,000 as a personal loan in connection with the Promissory Note. Ex. 2 at 1.

19. The June 7, 2011 Board Minutes further stated that "Mr. Chris Taylor requested [Richcom] to advance the loan to Mr. James Miller from the funds received from [TMH]. Mr. Chris Taylor indicated that Mr. James Miller, in his capacity as a partner in DLA-Piper Washington DC, *will play a crucial role in the buy/sell transactions of Medium-Term Notes with institutional clients*." Id. (emphasis added).

20. On June 8, 2011, Richcom transferred $600,000 from its bank account at HSBC to Miller's account at SunTrust Bank in Washington, D.C. Miller received the funds on June 9, 2011. Miller represents that he used $180,000 of the money to pay U.S. taxes that were accelerated in connection with his transfer from the law firm of Winston & Strawn LLP to DLA

---

[1] All references to exhibits attached to this Complaint are indicated as "Ex. __".

5

Piper in 2011, and used the remaining balance to pay down various debts to SunTrust Bank and other creditors.

21. Miller implausibly claims that he understood the funds to be a personal loan from Taylor that came from his own personal funds. A number of suspicious circumstances surrounding the Promissory Note, however, showed that the $600,000 did not come from Taylor's personal funds. An experienced attorney such as Miller could not have missed these obvious points.

22. First, the HSBC Telegraphic Transfers/Interbank Fund Transfer Application form dated June 8, 2011, (the "HSBC Transfer Form," a true and correct copy of which is attached as Ex. 3) sent to Miller in connection with the $600,000 transfer, listed Tao and Richcom as transferors rather than Taylor. Miller claims that he thought that Richcom and Tao were acting as agents in transferring the funds on behalf of Taylor. After Miller called Tao to confirm transfer of the $600,000, Taylor suspiciously instructed Miller not to speak with Tao in the future.

23. Second, Taylor and Miller had never met, having only spoken by telephone on several occasions. Nonetheless, Taylor was somehow willing to "lend" Miller $600,000 on extremely unusual and improbable terms—no stated maturity (but repayable only when "mutually agreeable"), automatic cancellation at Miller's death, very low interest due only at final maturity, and no apparent means of repayment.

24. Third, Miller claims not to know Taylor's business or personal address in the Philippines. It is hard to imagine that an experienced lawyer such as Miller actually believed that this transaction constituted a bona fide loan from Taylor's own funds.

**TMH Commences the Hong Kong Lawsuit to Recover the Funds**

25. In mid-September 2011, TMH's proper management learned of the Sham Agreements and the fraud perpetrated against it by Safronov, Richcom, and Tao.

26. In mid-October 2011, TMH located Tao, notified him that the Sham Agreements were carried out without TMH's authority and demanded that he and Richcom account for and return the €20 million to TMH. Upon learning that the funds were held in bank accounts of Richcom and two affiliates at HSBC Hong Kong and Standard Chartered Bank Hong Kong, on October 24, 2011 TMH initiated attachment proceedings against Tao, Richcom, the affiliates and related defendants before the High Court of the Hong Kong Special Administrative Region Court of First Instance in Action No. 1806 of 2011 (the "Hong Kong Action"), and successfully froze the relevant bank accounts. A full statement of claim was filed in this proceeding on November 14, 2011 (the "Statement of Claim", a true and correct copy of which is attached as Ex. 4).

27. The Statement of Claim alleged that Richcom and affiliated entities knowingly received the €20 million and dishonestly assisted in procuring or causing its receipt and later dissipation with actual or constructive knowledge that Safronov entered into the Sham Agreements without proper authority, with no legitimate purpose, and in furtherance of an illegal scheme that constituted wrongful breach by Safronov of his fiduciary duties to TMH. In the Statement of Claim, TMH charged Richcom and affiliated persons and entities with knowing receipt and dishonest assistance, conspiracy, and unjust enrichment and claimed damages of €20 million and costs and expenses incurred by TMH in its investigation of the Sham Agreements.

28. On June 4, 2012, TMH and Richcom entered into a settlement agreement (the "Settlement Agreement") providing that Richcom and the other defendants would return to

TMH all funds then in the frozen bank accounts of Richcom and the two affiliates (roughly €19.5 million including interest).  Further, section 1(b) of the Settlement Agreement provides that Richcom and certain of its principals and affiliates "shall use their best efforts to procure the assignment to TMH of the Promissory Note, dated June 6, 2011, in the amount of US $600,000, from James Forrest Miller in favor of Chris Taylor[.]"  Thereafter, despite repeated requests by TMH, Tao and Richcom have claimed that, notwithstanding their "best efforts", they have been unable even to locate Taylor (a past and perhaps current Richcom director) for purposes of procuring assignment of the Promissory Note.

29. In any event, although TMH has, under the Settlement Agreement, recovered most of the money that was improperly transferred to Richcom, TMH has yet to recover the stolen funds that were transferred to Miller.

**TMH Contacts Miller, But He Refuses To Return The $600,000**

30. In the course of the Hong Kong Action, TMH discovered that Miller received the $600,000 from Richcom as a transfer derived from the €20 million stolen from TMH.

31. On February 8, 2012, TMH called Miller in the U.S. and explained that his name came up in connection with the use of the €20 million improperly transferred from TMH to Richcom as part of an international criminal conspiracy.  Miller admitted to TMH that he received $600,000 as a loan from Taylor on June 9, 2011, and signed the Promissory Note to Taylor on June 6, 2011.

32. Miller further explained that he had never met Taylor but had spoken to him numerous times by telephone.  Miller claimed that Taylor agreed to the loan in significant part because Miller used his connections in the U.S. Treasury Department to perform due diligence on a potential transaction involving Taylor and gold previously owned or controlled by

8

former Philippine president Ferdinand Marcos (the "Marcos gold"), which transaction fell through because it turned out to be a scam.  Even though the Marcos gold deal failed, in recognition of the Marcos gold due diligence that Miller performed and in view of possible future transactions together, Taylor agreed to "lend" Miller $600,000 pursuant to the Promissory Note drafted by Miller, which provided for repayment only at a "mutually agreeable" date, interest at one-year Libor plus one percent payable only at maturity, and automatic cancellation upon Miller's death.

33. TMH notified Miller that Richcom's defence filed in the Hong Kong Action on January 10, 2012 (the "Defence", a true and correct copy of which is attached as Ex. 5) stated that on June 7, 2011, Richcom resolved to lend $600,000 to Miller, a DLA-Piper partner who would "play a crucial role in the proposed buy/sell transactions of [medium term notes] with institutional clients under [the Sham Agreements]." Ex. 5 at 11-12.

34. After learning about this statement in the Richcom Defence from TMH, Miller filed an affidavit dated February 11, 2012 (the "Affidavit", a true and accurate copy of which is attached as Ex. 6.) in the Hong Kong Action admitting that he signed the Promissory Note and received $600,000 as a loan from Chris Taylor on June 9, 2011.  In the Affidavit, Miller denied any connection with Richcom and stated that he thought the $600,000 came from Taylor's personal funds.

35. Even if, despite the many suspicious factors surrounding the Promissory Note, Miller somehow received the $600,000 in good faith, Miller clearly learned from speaking with TMH in February 2012 that the $600,000 derived from the €20 million improperly transferred from TMH to Richcom.

36. Despite knowing for one and a half years that he is in wrongful possession of TMH's funds as a result of the international conspiracy, Miller has refused to return the $600,000 to its rightful owner, TMH.  Indeed, on the February 8, 2011, telephone call with TMH, Miller volunteered that he would have to return the $600,000 to TMH and claimed that he could not pay it at that time but could pay it on a schedule to be negotiated with TMH.  He has not done so.

37. Miller refuses to return the stolen funds to TMH because Miller conveniently insists that Taylor, as holder of the Promissory Note, is the true claimant to the $600,000.  Meanwhile, despite TMH's repeated requests, Tao and Richcom claim that they are unable to locate Taylor for purposes of procuring assignment of the Promissory Note to TMH as specified in the Settlement Agreement.

38. Miller's posturing defies common sense, considering there is virtually no chance that Taylor would appear in any court of law to try to enforce the Promissory Note that was funded by a third party using stolen money.  Miller, a lawyer himself, no doubt understands this.

## CAUSES OF ACTION

### COUNT I
(Conversion Against Defendants)

39. TMH incorporates all the above allegations as though fully set forth and restated herein.

40. On June 3, 2011, as part of a criminal conspiracy that began in Switzerland and expanded to Hong Kong, €20 million was stolen from TMH's account at Clariden Leu Bank in Zurich and wrongfully transferred to Richcom's account at HSBC Bank in Hong Kong.

41. TMH has the possessory right and interest to all property in Miller's possession that he received by virtue of the €20 million stolen from TMH in connection with the Sham Transactions. Miller is not authorized, and has never been authorized, to exercise dominion and control over the $600,000 rightfully belonging to TMH. These specifically identified funds have been wrongfully converted by Miller.

42. TMH has the possessory right and interest to Taylor's rights under the Promissory Note with Miller, and to any of the $600,000 plus interest that Miller has repaid to Taylor under the Promissory Note (if any).

43. On June 5, 2011, Taylor, who is a director at Richcom, exercised unlawful ownership, dominion, or control of the stolen money by arranging for Richcom to transfer $600,000 of the stolen money to Miller as a purported "loan" from Taylor to Miller. To document this "loan", Miller himself drafted and signed the Promissory Note in favor of Taylor on June 6, 2011.

44. On June 8, 2011, $600,000 of the stolen money was wrongfully transferred from Richcom's account at HSBC Bank in Hong Kong to Miller's account at SunTrust Bank in Washington, D.C.

45. After receiving the $600,000, Miller exercised unlawful ownership, dominion, or control of the stolen money by wrongfully spending it on various personal debts and expenses.

46. On February 8, 2012, after discovering the wrongful transfer of the $600,000 to Miller, TMH notified Miller that TMH is the rightful owner of the stolen money that was wrongfully transferred to Miller.

47. Since then, TMH has made further requests to Miller seeking repayment of the stolen money.

48. Although Miller has acknowledged that he must repay the stolen money, he has repeatedly made excuses to avoid or delay repayment to TMH.

49. To date, Miller has still not repaid the stolen money to TMH, or made arrangements with TMH to set up a reasonable payment plan to repay the stolen money.

50. As a result of Taylor's wrongful transfer of the stolen money to Miller and Miller's wrongful use of the stolen money, TMH has suffered damages in the amount of $600,000 plus interest.

**COUNT II**
(Unjust Enrichment Against Defendants)

51. TMH incorporates all the above allegations as though fully set forth and restated herein.

52. Miller has wrongfully and unconscionably benefitted as a result of his unlawful exercise of ownership, dominion, or control of the $600,000 stolen from TMH in connection with the Sham Agreements. Miller has unjustly retained benefits by wrongfully using the stolen money to pay off his personal debts and expenses. Despite knowing for over a year and a half that he received $600,000 of funds stolen from TMH, Miller has refused to return the money to TMH. It would offend principles of equity and good conscience to permit Miller to retain the $600,000 when he is fully aware that such money belongs to TMH.

53. Taylor has wrongfully and unconscionably benefited as a result of his unlawful exercise of ownership, dominion, or control of the $600,000 stolen from TMH in connection with the Sham Agreements. He has unjustly retained benefits by wrongfully

transferring the stolen money to Miller as a purported "loan" in exchange for the Promissory Note from Miller promising to repay the same. In addition, he has retained the benefits of Miller's gratitude, good will, and cooperation in future business ventures. It would offend principles of equity and good conscience to permit Taylor to retain such benefits and rights to the Promissory Note.

54.  As a result of Defendants' unjust enrichment from their unlawful exercise of ownership, dominion, or control of the stolen money, TMH has suffered damages in the amount of $600,000 plus interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests an order and judgment from the Court:

1.  Awarding Plaintiff full compensatory damages on its claims in an amount of $600,000;

2.  Awarding Plaintiff pre- and post-judgment interest to the extent that it will make Plaintiff whole;

3.  Awarding Plaintiff the costs and expenses of suit and attorneys' fees; and

4.  Awarding Plaintiff appropriate punitive damages in an amount sufficient to punish Defendants, one of whom is a lawyer and officer of the court who has both a legal and ethical obligation to uphold the law, for their tortious conduct accompanied with bad faith, ill will, and willful disregard of Plaintiff's property rights; and

5.  Granting such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims on which it has the right to trial by jury.

Dated: New York, New York
November 21, 2013

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
Michael R. Lazerwitz
A Member of the Firm
(D.C. Bar No. 430605)

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Plaintiff JSC Transmashholding